1997 SD 35

**In the Matter of the Petition for Declaratory Ruling of NORTHWESTERN PUBLIC SERVICE COMPANY with Regard to Electric Service to Hub City.**

Nos. 19520, 19528.

Supreme Court of South Dakota.

Argued Sept. 11, 1996.

Decided April 2, 1997.

Mark Barnett, Attorney General, Karen Cremer, Special Assistant Attorney General, Pierre, for appellant, Public Utilities Commission.

Susan Anderson Bachman, Alan D. Dietrich, Huron, for appellant, Northwestern Public Service.

Harvey A. Oliver, Jr. of Richards and Oliver, Aberdeen, for appellee, Northern Electric Cooperative.

TIMM, Circuit Judge.

[¶ 1] On January 3, 1995, the Public Utilities Commission (PUC) authorized Northwestern Public Service Company (NWPS) to replace Northern Electric Cooperative (NEC) as supplier of electricity to Hub City, Inc. NEC appealed to the circuit court, Fifth Judicial Circuit. There, the PUC's decision was overturned. The PUC and NWPS appeal to this Court. Here, the circuit court is affirmed.

## BACKGROUND

[¶ 2] In 1977 Safeguard Automotive Corporation (Safeguard) operated a manufacturing plant in the Aberdeen Industrial Park. The plant was located in the assigned service area of NWPS. Its electrical needs were served by that utility.

[¶ 3] That same year a division of Safeguard, Safeguard Metal Casting (Division), planned to build an addition, a foundry, onto the manufacturing plant. The foundry too would be within the assigned service area of NWPS. However, due to a rate advantage offered by NEC, Division petitioned the PUC for relief from its obligation to take service from NWPS.

[¶ 4] Division's petition was based on SDCL 49–34A–56, the new customer, new location, large load provision of the South Dakota Territorial Integrity Act. NWPS intervened in opposition. After hearing, the PUC issued an order and decision assigning NEC as the foundry's electric supplier.

[¶ 5] On December 21, 1977, an "Agreement For Electric Service" (Agreement) was entered into obligating Division to purchase a minimum of 2000 kilowatts of electric power per month from NEC at a specified rate. The term of the agreement was set at five years. After that time, either party could terminate the agreement by giving twelve month's written notice.

[¶ 6] In 1986 Division's foundry ceased operations. The physical plant was converted to use as a warehouse. In 1989 Safeguard's successor, Hub City, Inc. (Hub City) purchased the foundry site from Division. It continued to be used as a warehouse until 1993 when Hub City began to move in some of its production processes.

[¶ 7] In June 1993 Hub City informed NEC that it wanted to be served electricity by one supplier, NWPS, at the manufacturing plant and foundry addition, and asked NEC to coordinate with NWPS to accomplish single utility service. The cost of electricity from NWPS would be below the cost incurred through NEC. In March 1994 Hub City notified NEC to end electric service to the foundry site as of June.

[¶ 8] In May 1994 NWPS petitioned the PUC for a declaratory ruling framing the issue this way:

[¶ 9] **Should Hub City be allowed to terminate the former Safeguard Metal Casting Division electric service agreement with Northern Electric Cooperative, Inc., and receive electric service from Northwestern Public Service Company for its total plant?**

[¶ 10] NEC intervened. The case was submitted on stipulated facts and affidavits (regarding the intent of the parties to the Agreement). The PUC decided in favor of NWPS, concluding that a switch in suppliers was justified by "significant changes in circumstances," and that the agreement provided Division (and its successor, Hub City) a contractual right to terminate NEC as its electric supplier.

[¶ 11] On appeal to circuit court, the PUC's decision was reversed. First, the circuit court read certain provisions of SDCL 49–34A to grant NEC an exclusive right to serve the Hub City site, which right could only be disturbed upon determination by the PUC that NEC could no longer provide adequate service. Since it was uncontested that NEC could provide adequate service, the Court concluded that the PUC made a mistake of law by applying a "significant change in circumstances" test in determining whether NEC could be replaced by NWPS as Hub City's supplier. Second, the circuit court concluded that the PUC lacked authority to interpret or enforce a contract in a dispute between a consumer and a rural electric cooperative.

[¶ 12] NWPS and the PUC appeal.

## ISSUES

[¶ 13] The issues are (1) whether the PUC predicated its decision on a mistake of law, and (2) whether the PUC acted in excess of its authority. These are issues of law fully reviewable without deference to legal conclusions drawn by either the PUC or the circuit court. *See Egemo v. Flores,* 470 N.W.2d 817 (S.D.1991); *Permann v. Dept. of Labor,* 411 N.W.2d 113 (S.D.1987).

## MISTAKE OF LAW

[¶ 14] The resolution of the first issue turns on the legislative intent of various provisions of Chapter 49–34A of the South Dakota Codified Laws. In reading these statutes we are guided by certain familiar rules. The intent of the legislature is "derived from the plain, ordinary and popular meaning of statutory language." *Whalen v. Whalen,* 490 N.W.2d 276, 280 (S.D.1992). Statutes are to be read in pari materia. *Simpson v. Tobin,* 367 N.W.2d 757 (S.D.1985). It is presumed that the legislature intended provisions of an act to be consistent and harmonious. *State v. Chaney,* 261 N.W.2d 674 (S.D.1978). It is also presumed that the legislature did not intend an absurd or unreasonable result. *Applications of Black Hills Power and Light Co.,* 298 N.W.2d 799 (S.D.1980).

[¶ 15] In 1975 the legislature enacted the "South Dakota Territorial Integrity Act" (Act), now codified at Chapter 49–34A. The policy underlying the Act was "elimination of duplication and wasteful spending in all segments of the electric utility industry." *Matter of Certain Territorial Elec. Boundaries (Mitchell Area),* 281 N.W.2d 65, 70 (S.D. 1979). To accomplish that end, exclusive territories designated "assigned service areas," were established for each utility. *See Matter of Clay–Union Elec. Corp.,* 300 N.W.2d 58, 60 (S.D.1980). To ensure the integrity of a territory, the legislature granted each utility the exclusive right to "provide electric service at retail ... to each and every present and future customer in its assigned service area." SDCL 49–34A–42.

[¶ 16] The Act contains several provisions whereby electrical consumers may have their provider changed. SDCL 49–34A–38 through 49–34A–59. Reference is made to these provisions as establishing assigned service areas within which the new provider has exclusive service rights at SDCL 49–34A–1(1) and SDCL 49–34A–42. SDCL 49–34A–1(1) defines "assigned service area" as "the geographical area in which the *boundaries are established as provided in* §§ 49–34A–42 to 49–34A–44, inclusive, and *§§ 49–34A–48 to 49–34A–59, inclusive*." (emphasis added) The last paragraph of SDCL 49–34A–42, the "exclusive right" provision of the Act, states that "The commission shall have the jurisdiction to enforce the *assigned service areas established by* §§ 49–34A–42 to 49–34A–44, inclusive, and *§§ 49–34A–48 to 49–34A–59, inclusive*." (emphasis added)

[¶ 17] In 1977 Hub City's predecessor availed itself of one of these provisions, SDCL 49–34A–56. It elected to seek authorization from the PUC to receive electric service from NEC rather than NWPS, the utility within whose assigned service area it would have been located. SDCL 49–34A–56 provides:

> Notwithstanding the establishment of assigned service areas for electric utilities provided for in §§ 49–34A–43 and 49–34A–44, new customers at new locations which develop after March 21, 1975, located outside municipalities as the boundaries thereof existed on March 21, 1975, and who require electric service with a contracted minimum demand of two thousand kilowatts or more shall not be obligated to take electric service from the electric utility having the assigned service area where the customer is located if, after notice and hearing, the public utilities commission so determines after consideration of the following factors:
>
> (1) The electric service requirements of the load to be served;
>
> (2) The availability of an adequate power supply;
>
> (3) The development or improvement of the electric system of the utility seeking to provide the electric service, in-

cluding the economic factors relating thereto;

> (4) The proximity of adequate facilities from which electric service of the type required may be delivered;
>
> (5) The preference of the customer;
>
> (6) Any and all pertinent factors affecting the ability of the utility to furnish adequate electric service to fulfill customers' requirements.

[¶ 18] The PUC and NWPS focus on this statute and suggest that after NEC was assigned and service extended, Division and its successors retained a right to be assigned to the service area of NWPS upon the PUC's determination of changed circumstances. We disagree.

[¶ 19] By reading SDCL 49–34A–56 in pari materia with SDCL 49–34A–1(1) and SDCL 49–34A–42, it is clear that the PUC's action in 1977 established the Hub City location as part of the assigned service area of NEC. Concomitantly, NEC acquired the exclusive right to provide retail electric service at that location.

[¶ 20] The "retained right" alluded to by the PUC and NWPS is illusive when reading SDCL 49–34A–56. There is no express language establishing such a right in the customer. Nor does that provision yield such a right when read in conjunction with other provisions of the Act. The plain language of the statute indicates the legislature intended it to do nothing more than provide a new large load customer at a new location an option to be exercised prior to receipt of service. The successful exercise of the option does not beget another option.

[¶ 21] To subscribe to the "retained right" theory of the PUC and NWPS would be to ascribe an intent to the legislature contrary to the policy underlying the Act. The result: duplication of services and wasteful spending, the precise evils the Act was designed to avoid. In this case NEC lines would be stranded. NWPS would incur the expense of extending lines to the site. The change

would cost NWPS $5,400 and waste NEC's capital investment of $80,065. Ultimately these costs would be passed on to the customers of the utilities. We do not believe the legislature intended such a result and decline to read SDCL 49–34A–56 in the manner suggested by the PUC and NWPS.

[¶ 22] The PUC and NWPS also assert that the PUC may authorize a change in electrical providers pursuant to its implied powers where there is a change of circumstances.

[¶ 23] This Court has recognized that the PUC has certain implied powers. In the *Matter of Northern States Power Co.*, 489 N.W.2d 365 (S.D.1992). Where the legislature prescribes a standard of guidance for the administrative agency to follow, the necessary implied authority may also be delegated to the administrative agency to carry out the specific purposes prescribed and to exercise the appropriate administrative power to regulate and control. In re *Application of Kohlman*, 263 N.W.2d 674, 678 (S.D.1978).

[¶ 24] The standard of guidance under SDCL 49–34A is the "elimination of duplication and wasteful spending in all segments of the electric utility industry." *Matter of Certain Territorial Boundaries (Mitchell Area)*, 281 N.W.2d at 70. To that end, the legislature created a system of exclusive territories which could only be changed under certain specified conditions consistent with the intent of the Act. *See* SDCL 49–34A–48 through 59.

[¶ 25] The PUC's declaratory ruling in this case falls outside the scope of its implied powers. First, the conditions which exist in this case are not in SDCL 49–34A as a basis for a change of provider. There is no provision for change of provider where there's been a change of ownership, or the customer changes its preference, or there's a load reduction, or where another utility offers a lower rate, or where a service agreement between a utility and a customer expires. Second, the PUC cannot show that permitting a change of providers for any of the forgoing reasons advances the purpose of

the Act. As previously noted, the result is the opposite.

[¶ 26] The circuit court is affirmed on this issue.

## EXCESS AUTHORITY

[¶ 27] The second issue concerns whether the PUC exceeded its authority by interpreting and enforcing the electric service agreement between Hub City and NEC.

[¶ 28] There are two types of electric utilities involved in this case. NEC is a rural electric cooperative. NWPS is a public utility. Chapter 49–34A provides that the PUC has different authority over each type of utility. A "public utility" is defined as:

any person operating, maintaining or controlling in this state equipment or facilities for the purpose of providing gas or electric service to or for the public in whole or in part,.... However, the term does not apply to an electric or gas utility owned by a municipality, political subdivision, or agency of the state of South Dakota or any other state or a rural electric cooperative as defined in § 47–21–1 for the purposes of §§ 49–34A–2 to 49–34A–4, inclusive, §§ 49–34A–6 to 49–34A–41, inclusive, and § 49–34A–62[.]

SDCL 49–34A–1(12)(emphasis added). Therefore, while the PUC has authority over the NEC for determining whether its service is adequate or to make territorial assignments, it has no authority over NEC with regard to rates (SDCL 49–34A–6 to 49–34A–26, inclusive). NEC's agreement with its customer is one regarding the service provided and the rate. There is no allegation that the service is inadequate and the PUC has no authority to make any determination as to rates. The PUC based its ruling on the termination clause included in that agreement. This would appear to be a contract dispute between NEC and Hub City's successor in interest and clearly beyond the PUC's authority.

[¶ 29] "While the expertise of the administrative agency is recognized, the agency

must lend credence to the guidelines established in the statutes." *Matter of Certain Territorial Electric Boundaries (Mitchell Area)*, 281 N.W.2d at 69. *See also Matter of Certain Territorial Elec. Boundaries (Aberdeen)*, 281 N.W.2d 72, 76 (S.D.1979); *Williams Electric Co–op. v. Montana–Dakota Util. Co.*, 79 N.W.2d 508, 517 (N.D.1956). The PUC's authority is outlined in Chapter 49–34A:

The commission shall regulate to the extent provided in this chapter every public utility as defined herein. The commission may promulgate rules pursuant to chapter 1–26 in furtherance of the purposes of this chapter concerning:

(1) Procedures and requirements for applications for rate and tariff changes;

(2) Requirements for gas and electric utilities to maintain and make available to the public and the commission records and information;

(3) Requirements and procedures regarding customer billings and meter readings;

(4) Requirements regarding availability of meter tests;

(5) Requirements regarding billing adjustments for meter errors;

(6) Procedures and requirements for handling customer disputes and complaints;

(7) Procedures and requirements regarding temporary service, changes in location of service and service interruptions;

(8) Standards and procedures to ensure nondiscriminatory credit policies:

(9) Procedures, requirements and record-keeping guidelines regarding deposit policies;

(10) Procedure, requirements and record-keeping guidelines regarding customer refunds;

(11) Policies for refusal of gas or electric service;

(12) Policies for disconnection and transfer of gas and electric service;

(13) Customer payment plans for delinquent bills; and

(14) Requirements regarding advertising.

SDCL 49–34A–4. Even though this statute only applies to the PUC's relationship with public utilities, not rural cooperatives, it does not include contract interpretation as an authority or power of the PUC.

[¶ 30] The PUC is not a court, and cannot exercise purely judicial functions. *Application of Dakota Transportation, Inc.*, 67 S.D. 221, 291 N.W. 589, 594 (1940). As the North Dakota Court has stated,

As a general rule administrative agencies, boards, and commissions cannot consider, or adjudicate, contractual rights and obligations between parties. Hence they cannot pass on the validity of, or enforce, nor can administrative agencies, boards, or commissions change or annul contracts, except where they have been granted power by organic or valid statutory enactment to do so.

*Williams Elec. Coop.*, 79 N.W.2d at 517. The PUC has exceeded its statutory authority by interpreting and enforcing the contract between a rural cooperative, NEC, and its customer. *See* In the Matter of the *Application of City of White*, 294 N.W.2d 433 (S.D. 1980) (holding that the PUC has no authority to determine the amount of compensation due an electric utility for service contracts). The circuit court is affirmed on this issue as well.

[¶ 31] MILLER, C.J., and SABERS, AMUNDSON and KONENKAMP, JJ., concur.

[¶ 32] TIMM, Circuit Judge, for GILBERTSON, J., disqualified.