Unified Judicial System

 

 
 U S WEST COMMUNICATIONS, INC.
Petitioner and Appellant v.
AT&T COMMUNICATIONS OF THE MIDWEST, INC., SPRINT COMMUNICATIONS, COMPANY, L.P., MCI TELECOMMUNICATIONS CORPORATION, TELECOMMUNICATIONS ACTION GROUP AND DAKOTA TELECOMMUNICATIONS GROUP
Intervernors and Appellees [2000 SD 140]
South Dakota Supreme Court
Appeal from the Circuit Court of The Sixth Judicial Circuit
Hughes County, South Dakota
Hon. Steven Zinter, Judge
THOMAS J. WELK and TAMARA A. WILKA Boyce, Murphy, McDowell & Greenfield, Sioux Falls, South Dakota
Attorneys for Petitioner and Appellant JOHN S. LOVALD
Olinger, Lovald, Robbennolt and McCahren, Pierre, South Dakota
Attorneys for Appellee AT&T
THOMAS H. HARMON
Tieszen Law Office, Pierre, South Dakota Attorneys for Appellee Sprint
ANDREW JONES
Kansas City, Missouri Attorney for Appellee Sprint
DAVID A. GERDES
May, Adam, Gerdes and Thompson, Pierre, South Dakota
Attorney for Appellee MCI
ROBERT C. RITER, JR
Riter, Mayer, Hofer, Wattier & Brown, Pierre, South Dakota
Attorney for Appellee Teleco. Action Group
ROLAYNE AILTS WIEST
Special Assistant Attorney General, Pierre, South Dakota
Attorneys for appellee PUC
 
Argued September 19, 2000
Opinion Filed 11/8/2000
 
SABERS, Justice
[Â¶1.] The South Dakota Public Utilities Commission (PUC) approved an incremental rate increase for US Westâs switched access service over a three-year period.  The circuit court affirmed.  US West appeals.  We affirm.
FACTS
[Â¶2.] Essential to the operation of the telecommunications systems is the switched access service.  This ânoncompetitive serviceâ facilitates communication between consumers who have chosen different providers for their telephone services.  In application, a switched access service rate is charged to the âresellâ carrier for originating and terminating access to customers who employ a different carrier.[1]   Obviously, this rate has a direct effect on the profits of resell carriers. 
[Â¶3.] Historically, US West had foregone revenues from the switched access service it provided to long distance carrier companies.  In 1994, US West petitioned the PUC for price regulation and, on March 30, 1994, began charging 3.14 cents per minute for intrastate switched access transactions.  
[Â¶4.] On June 12, 1995, US West entered into a stipulation with the PUC and agreed that the rates charged for switched access services would be determined by a price regulation plan[2]  and not by rate of return regulation.[3]   Furthermore, a price ceiling was to be determined by âusing the switched access rules found in ARSD 20:10:27 through 20:10:29.â  The duration was also addressed:
The Parties agree . . . that this price regulation plan should remain in effect until such time as the Parties shall mutually agree to its termination, revision or amendment.  Either US West or the [PUC] may unilaterally terminate this price regulation plan if any authority of the [PUC] necessary for the effective administration of this Stipulation are preempted by federal legislation or federal regulatory order or rule; or by any order of the [PUC] that substantially alters the pricing flexibility provided for in this Stipulation.  . . . 
 
[Â¶5.] In 1996, US West determined that it could no longer afford to provide this service at 3.14 cents per minute.  US West conducted a cost study and filed it for approval with the PUC on June 24, 1996.  The study supported a rate increase of 6.6 cents per minute for switched access service.  Later, on June 13, 1997, pursuant to SDCL 49-31-12.4, US West implemented a rate of 6.4 cents per minute. 
[Â¶6.] On July 30, 1996, the following companies were allowed to intervene:  Sprint Communications Company; MCI Telecommunications Corporation; Express Communications, Inc., AT&T Communications of the Midwest, Inc.; Telecommunications Action Group (TAG)[4] ; and Dakota Cooperative Telecommunications, Inc.  Express Communications, Inc. later withdrew from the action.
[Â¶7.] A hearing was held before the PUC on October 9-10, 1996.  During this hearing, US West presented a second cost study report, which supported a rate increase for switched access service of 6.4 cents per minute, down two-tenths of a cent from its first cost study report.  Three PUC staff members proposed a rate of 6.15 cents per minute and US West acceded.  US West then sought approval from the PUC for that rate.
[Â¶8.] In a 2-1 vote, the Commission reopened the record on December 19, 1996 based, in part, on its determination that the numbers presented by US West were not verified.[5]   AT&Tâs motion to disapprove the rate increase and close the docket was granted on January 27, 1997.  US West appealed.  In reversing and remanding, the circuit court stated that â[t]he Commission did not find that itâs own staffâs witnesses were unreliable, unbelievable or not credible.â
[Â¶9.] Based on the circuit courtâs reversal, US West implemented the rate of 6.4 cents per minute on June 13, 1997.[6]   On July 3, 1997, the PUC issued an Order to reopen the record and specifically rejected the analysis of the PUC staff members.  It determined that US Westâs responses to data requests were not obtained under oath and its cost study calculations were not independently verified by the PUC staff for accuracy or validity.  Based on those determinations, the PUC ordered its staff to conduct an on-site investigation and file its own report.  It also required that any additional evidence received be verified by US West employees.
[Â¶10.] On December 1, 1997, US West implemented the rate of 4.14 cents per minute.
[Â¶11.] On September 23, 1998, the PUC found that because the rate increase to 6.15 cents per minute was more than a 100 percent increase, it would constitute a ârate shockâ if implemented immediately.[7]   It also determined that the increase in access charges would result in a 58.1% decrease of net income to some TAG members.[8]    Consequently, the PUC ordered that the rate increase be implemented in increments, as follows:
June 13, 1997 $0.0364;
December 1, 1997 $0.0414;
June 1, 1998    $0.0465;
December 1, 1998 $0.0515;
June 1, 1999    $0.0565;
December 1, 1999 $0.06095.
 
The PUC also ordered that US West refund or credit its switched access customers the difference between the rate US West implemented on June 13, 1997 (6.4 cents) and the rate the PUC approved effective on the same date (3.64 cents) with 9.62% interest per annum.[9]   US West appealed to the circuit court.
[Â¶12.] The circuit court affirmed the PUCâs decision but remanded for reconsideration of two confidential exhibits 154 and 160.  After reconsideration, the PUC entered amended findings of fact and conclusions of law consistent with its second decision.  The circuit court affirmed.  US West appeals.
STANDARD OF REVIEW
[Â¶13.] SDCL 1-26-36 requires this court to afford âgreat weight to the findings made and inferences drawn by [the PUC] on questions of fact.â  It further allows this court to 
[R]everse or modify [a PUC] decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
 
(1)   In violation of constitutional or statutory provisions;
(2)   In excess of the statutory authority of the agency;
(3)   Made upon unlawful procedure;
(4)   Affected by other error of law;
(5)   Clearly erroneous in light of the entire evidence in the record; or
(6)   Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
 
Accordingly, we review the administrative agencyâs decision without regard to the circuit courtâs decision.[10]   US West Communications, Inc., 505 NW2d at 122 (citation omitted).  However, questions of law, including statutory interpretation, are reviewed de novo.  Id. (citation omitted).
[Â¶14.] Interpretation of a contract is a question of law, which is reviewed de novo.  Hayes v. Northern Hills General Hosp., 1999 SD 28, Â¶62, 590 NW2d 243, 254. If the meaning of the contract language is plain and unambiguous, construction is not necessary.  However, if the contract language is ambiguous, the rules of construction apply.  See Alverson v. Northwestern Natâl Cas. Co., 1997 SD 9, Â¶8, 559 NW2d 234, 235.  âWhether the language of a contract is ambiguous is . . . a question of law.â  Enchanted World Doll Museum v. Buskohl, 398 NW2d 149, 151 (SD 1986) (citation omitted).  
[Â¶15.] 1.           WHETHER THE PUC EXCEEDED ITS AUTHORITY IN 
ORDERING THE INCREASED SWITCHED ACCESS 
SERVICE RATE IN INCREMENTS.
 
[Â¶16.] âAdministrative agencies have only such adjudicatory jurisdiction as is conferred upon them by statute.â  Kjerstad v. Ravellette Publications, Inc., 517 NW2d 419, 423 (SD 1994).
[Â¶17.] US West claims that there is no express statutory authority authorizing the PUC to order that the increased switched access rate be implemented in increments.  Although that is true, it is also true that there is no express statutory authority prohibiting incremental rates.  It asserts that SDCL 49-31-4 authorizes the PUC to set âthe rateâ or âthe priceâ or âa rateâ or âa price,â but it does not authorize the PUC to set a âseries of staged rates or prices.â  US West also argues that the stipulation only permits it to set the price below the ceiling and that the stipulation denies such authority to the PUC.  We disagree.
[Â¶18.] SDCL 49-31-4 clearly provides that â[a]ny charge established for the provision of telecommunications services shall be fair and reasonable.â  It further requires the PUC to âdetermine and approve individual prices to be charged for a noncompetitive service[.]â  Therefore, the PUC has statutory authority to set the rates charged by US West for its switched access service.  This statutory authority is recognized and incorporated into the stipulation agreement entered into between the parties.  
[Â¶19.] The statutes and the stipulation entered into expressly guide the PUC in setting the rate.  In order to set a âfair and reasonable price,â the PUC is required to âdetermine and considerâ five factors:
(1)   the price of alternative services;
(2)   the overall market for the service;
(3)   the affordability of the price for the service in the market it is offered; 
(4)   the impact of the price of the service on the commitment to preserve affordable universal service; and
(5)   the fully allocated cost of providing the service.
 
SDCL 49-31-1.4.   This amounts to a legislative âstandard of guidance:â  
Where the legislature prescribes a standard of guidance for the administrative agency to follow, the necessary implied authority may also be delegated to the administrative agency to carry out the specific purposes prescribed and to exercise the appropriate administrative power to regulate and control.
 
In re Northwestern Public Service Co., 1997 SD 35, Â¶23, 560 NW2d 925, 929.
[Â¶20.] Summarily, the PUC is required by statutory authority and the stipulation entered into with US West to set a fair and reasonable rate and to consider five factors in so doing.  In order to carry out the specific purpose underlying those five factors, the PUC is vested with necessary implied authority.  Id.   
[Â¶21.] Here, the legislature requires the PUC to consider âthe affordability of the price for the serviceâ and the âimpact of the price of the serviceâ in order to carry out the specific purpose of âpreserv[ing] affordable universal service.â  Clearly, the PUC has necessary implied authority to structure a rate increase in increments to diminish the impact of a rate increase of more than 100 percent and to facilitate the affordability of the price of the service.  
[Â¶22.] Additionally, the PUC has general statutory authority to supervise and control telecommunications companies.  SDCL 49-31-3.  This court has determined that the underlying basis for this regulation is to protect the public interest:
Public service commissions are generally empowered to, and are created with the intention that they should regulate public utilities insofar as the powers and operations of such utilities affect the public interest and welfare.
 
Northwestern Bell Telephone Co., Chicago & NW Transportation, 245 NW2d 639, 642 (SD 1976).  Once this purpose is considered with the purpose of âpreserv[ing] affordable universal service,â it is clear that the PUC was vested with the necessary implied authority to effectuate those purposes.  This statutory authority, in connection with the stipulation entered into between the parties, permits the PUC to impose price increments to protect against ârate shock.â  Therefore, its decision to impose US Westâs switched access rate in increments was authorized.
[Â¶23.] 2.           WHETHER THE PUC WAS CLEARLY ERRONEOUS IN 
DENYING US WEST COMPENSATION DURING THE 
TIME PERIOD OF INCREMENTAL RATES.
 
[Â¶24.] US West argues that the PUC forced it to forego revenue by ordering that the rate increase be âphased-in.â  US West rationalizes that the PUC determined that it was entitled to an increased rate of 6.0905 cents per minute; however, it ordered that the rate be gradually implemented to avoid ârate shock.â  Consequently, US West claims that the PUC was clearly erroneous in failing to compensate US West for the revenue lost during the âphase-inâ time period.  It further argues that this error is amplified by the PUCâs order that US West refund, with interest, the difference between the actual rate charged on June 13, 1997 (6.4 cents) and the rate the PUC later approved to be effective on the same date (3.64 cents).
[Â¶25.] The PUC counters by questioning whether this was a âtrue phase-in.â  It concedes that under the ârate of returnâ regulation,[11]  a âtrue phase-in does not require a company to forego revenues.â  However, it argues that this case deals with price regulation and the setting of prices, not rate of return regulation.  Therefore, the PUC claims that US West âforfeited a right to what it envisions as lost revenues.â
[Â¶26.] In 1995, US West entered into a stipulation with the PUC.  The plain language of the stipulation acknowledges that switched access services would be determined by the price regulation plan, as set forth in SDCL 49-39-1.4, and not by the rate of return process:
10.     The prices for the following services will be determined by  this price regulation plan:
a.  Business and residential local exchange service;
b.      Switched access services . . . . 
 
(emphasis added).  Therefore, by its own stipulation, US Westâs switched access service is subject to price regulation and not rate of return regulation.
[Â¶27.] As noted by the PUC, the âphase inâ language and the effect thereof, as referred to by US West, are associated only with rate of return regulation.  Additionally, the cases cited by US West in support of its proposition are restricted to rate of return regulation calculations.  Consequently, US West has not shown that it was entitled to the lost revenues associated with the PUCâs gradual increase of the switched access service rate over three years. 
[Â¶28.] 3.           WHETHER THE PUC ERRED IN APPLYING SDCL 49-31-
            1.4.
 
[Â¶29.] US West claims that the PUC misinterpreted the 1995 stipulation.  It claims that the purpose of the stipulation, in regards to switched access rates, was to allow it the âflexibility to price below the price ceiling but never to exceed the rate authorized by the [PUC] model.â  It further claims that because it sought to set its rate at the price ceiling, or 6.0905 cents, the stipulation solely controlled this issue and SDCL 49-39-1.4 has no application.  Therefore, it argues that (1) the circuit court and PUC erred in interpreting the stipulation to require that âswitched access rates must be priced below the ceiling at different timesâ and that (2) the switched access rate should be set at 6.0905 cents per minute effective June 13, 1997.
[Â¶30.] This stipulation was signed on June 12, 1995 by US West and the PUC staff, with subsequent approval from the PUC.  Because the parties did not âmutually agree to its termination,â it was still effective at the time the PUC ordered the gradual increase for US Westâs switched access service.  The language is clear and unambiguous; therefore, construction is not necessary.  
[Â¶31.] As indicated, the purpose of the stipulation was to contractually establish that price regulation, versus rate of return regulation, would control the pricing of US Westâs switched access services.  Sections 11 and 15 of the stipulation further provide that any ceilings established or price changes implemented are to be consistent with SDCL 49-31-1.4:
11.        For purposes of this price regulation plan, prices for residence and business basic local exchange and switched access services will have a price ceiling.  US West will have the ability to flexibly price these noncompetitive services under the applicable price ceiling as described in this Stipulation, consistent with the provisions of SDCL 49-31-1.1, 49-31-4, 49-31-12, 49-31-12.2 and 49-31-12.4.
 
   *    * *
 
15.        The price ceiling for switched access services will be determined by using the switched access rules found in ARSD 20:10:27 through 20:10:29.[12]   Price changes will be consistent with the requirements of SDCL 49-31-1.4, 49-31-4, 49-31-12, 49-31-12.2 and 49-31-12.4, and the order in Docket No. TC93-108.[13] 
 
(emphasis added).  Clearly, the price established under the stipulation was intended as a ceiling which could not be exceeded, not a floor, and the process of setting that 
floor would be controlled by the PUCâs application of SDCL 49-31-1.4, or by US West, at its option.  See discussion at Â¶Â¶17, 18.    
[Â¶32.] As indicated in Issue 1, SDCL 49-31-1.4 establishes five factors that the PUC âshallâ consider in determining a fair and reasonable price for a service subject to price regulation.  The legislature has specifically allowed the PUC to implement rate increases which, by definition, must include the consideration of five factors.  Here, pursuant to the stipulation, the PUC applied the price regulation statute to determine US Westâs switched access service rate and its implementation.  It is clear from the findings of fact that the PUC considered these five factors, as statutorily required.  Therefore, the PUC was not clearly erroneous in applying the five factors of SDCL 49-31-1.4 in this price regulation case.
[Â¶33.] Affirmed.
[Â¶34.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP and GILBERTSON, Justices, concur. 

1.                   SDCL 49-31-1(25) defines âswitched accessâ as âan exchange access service purchased for the origination and termination of interexchange telecommunications services which includes central office switching and signaling, local loop facility, or local transport.â
 
It was also defined in US West Communications, Inc. v. Public Utilities Commân., 505 NW2d 115, 118 n2 (SD 1993) as âthe service that allows local customers to connect to long distance telephone companies.  âAccess chargesâ are charges assessed to the toll provider through which local exchange carriers are compensated for the use of network facilities.â 

2.                   Price regulation is defined in SDCL 49-31-1.4 as âthe procedure used by the [PUC] to approve the charge for an emerging or noncompetitive telecommunications service which is not based on rate of return regulation.â
 

3.                   SDCL 49-31-1(18) defines ârate of return regulationâ as:
the procedure used by the commission to approve the charge for a service which gives due consideration to the public need for adequate, efficient and reasonable service and to the need of the public utility for revenues sufficient to enable it to meet its total current cost of furnishing such service, including taxes and interest, and including adequate provision for depreciation of its utility property used and necessary in rendering service to the public, and to earn a fair and reasonable return upon the value of its property. 

4.                   TAG members include:  Midco Communications, TCIC Communications, TeleTech, FirstTel and Tel Serve.
 

5.                   In a dissenting opinion, Commissioner Stofferahn stated that the validity of the proposed increase at 6.15 cents had not been challenged.  He further argued that while AT&T questioned the cost study results because they were not audited, AT&T did not present any evidence to show that the numbers were wrong nor did they conduct their own audits. 

6.                   This was also done in accordance with SDCL 49-31-12.4, which provides the PUC with the authority to suspend the operation of an increased rate for 180 days.
 

7.                   âRate shockâ is a term used to describe âthe effect on utility customers when a utility implements a significantly increased rate immediately or in a relatively short time span.â
 

8.                   See footnote 4, supra, for a list of the TAG members.  Testimony was presented that if the proposed access rate was immediately implemented, the rate would have been one of the ten highest access rates in the nation.  The PUC, in its amended findings of fact and conclusions of law, set forth the switched access rate that US West charged in other states:
Montana:                      $0.043254;
North Dakota:  $0.063725;
Nebraska:                    $0.066832;
New Mexico:               $0.059442;
Wyoming:                     $0.0469467.
 
The PUC also found that â[b]ecause of the duration of the contracts which some resellers have with their respective customers, the costs which resellers would incur would be difficult to pass on to their customers . . . although at least one reseller, Midco, is reducing the duration of service contracts it enters into with consumers.â
 

9.                   In accordance with the PUC schedule, the rate of $0.06095 is currently being charged to resellers.
 

 10.         US West cites Iverson v. Wall Bd. of Educ., 522 NW2d 188, 192 (SD 1994), for  the standard of review in this appeal.  We do not use the abuse of discretion standard in these instances.  In Sopko v. C & R Transfer Co., Inc., 1998 SD 8, Â¶6, 575 NW2d 225, 228, we clarified that proper standard for review in administrative appeals is the the clearly erroneous standard. 

11.        See footnote 3, supra, for the statutory definition of ârate of return           
           regulation.â

12.        ARSD 20:10:27:20 provides:
Switched access rates for a telecommunications company may be phased-in over a period of time if the [PUC] finds the implementation of switched access rates as determined by the rules of chapters 20:10:27 to 20:10:29, inclusive, will result in a significant change in switched access rates or revenues and that a phase-in of rates is in the public interest.  The length of any phase-in period shall be determined by the [PUC].
AT&T argues that this evidences that US West âhas stipulated that âphase inâ would be an appropriate consideration for the [PUC] in pricing US Westâs switched access.â
 

 13.       This Order approved an agreement to gradually increase US Westâs switched access cost.  Under the PUC computer model, US Westâs cost of switched access was 6.7 cents.  However, the initial rate was set at 3.14 cents and was to be subsequently increased by the PUC.
 
AT&T argues that under this agreement and the 1995 stipulation, both of which are binding on US West, revenues foregone in the initial stage of the âphase inâ were not addressed.