2004 SD 11

**In the Matter of the Petition of West River Electric Association, Inc., for a Declaratory Ruling Regarding Service Territory Rights Concerning Black Hills Power, Inc., and WEST RIVER ELECTRIC ASSOCIATION, INC.**

**Nos. 22827, 22834.**

Supreme Court of South Dakota.

Argued Nov. 19, 2003.

Decided Jan. 28, 2004.

Gregory J. Erlandson, Allen G. Nelson of Bangs, McCullen, Butler, Foye and Simmons, Rapid City, South Dakota, Attorneys for appellant West River Electric.

Lawrence E. Long, Attorney General, John J. Smith, Assistant Attorney General, Public Utilities Commission, Pierre, South Dakota, Attorneys for appellant SD Public Utilities Commission.

Steven J. Helmers, General Counsel, Linden R. Evans, Associate Counsel, Black Hills Corporation, Rapid City, South Dakota, Attorneys for appellee Black Hills Power.

ZINTER, Justice.

[¶ 1.] Rapid City intends to expand its waste water treatment plant. West River Electric Association, Inc. (WREA) and Black Hills Power, Inc. (BHP) are in a dispute over the right to provide the increased electric service necessary for the expansion. WREA contends that it has the right to provide the new service because the plant is located within its service territory. BHP contends that it has the right to provide new service as the plant grows because it has provided the past service at that "location." The Public Utilities Commission (PUC) ruled that BHP's statutory right to continue to serve a "location" did not include the right to increase the electricity provided because the new load required changes in BHP's distribution system. The circuit court reversed, concluding that the right to continue to serve a "location" meant the right to serve a geographical location. Therefore, the court held that BHP was entitled to provide the increased load at the plant. We affirm the circuit court.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] In 1975, the Legislature enacted the "Territory Act," SDCL ch. 49–34A, which completely revised the electric utilities' territories in which they provide electrical service. This Act was adopted to reduce wasteful spending and the duplication of services in the industry. The Act gave the PUC the power to assign specific service areas to each utility. These areas were geographically defined and provided boundaries in which each utility enjoyed the right to provide exclusive service.

[¶ 3.] However, the Act also authorized utilities to continue to serve existing "locations" where they were serving "a customer." It provided, "[e]ach electric utility has the exclusive right to provide electric service at retail at each and every *location* where it is serving *a customer* as of March 21, 1975," even if that location was in another utility's territory. SDCL 49–34A–42 (emphasis added). Customers that continued to be serviced by an out of territory utility under this provision are referred to as "frozen customers" in the industry.

[¶ 4.] The Rapid City waste water treatment plant is one such frozen customer. The land on which the plant is situated is within the territory that was assigned to WREA. However, BHP was providing service to that location on March 21, 1975. Therefore, BHP had the "exclusive right" to continue to provide service at that "location." This dispute developed because the plant's need for electricity has increased, and the parties are unable to agree whether providing the increased load is within this statutory right to provide service at a "location."

[¶ 5.] The origin of this dispute actually began to develop in the 1960s. In 1965, the city purchased forty acres of land for the waste water treatment plant. Because WREA was already providing electric service to that area, it constructed a 3–phase primary voltage distribution line to con-

struct the plant. WREA also began providing electric service to the plant.

[¶ 6.] However, in 1967, pursuant to the territory law in effect at that time, voters in Rapid City approved a city council proposal to change service providers and "accept service from Black Hills Power & Light for furnishing power to the new waste water treatment plant [then] under construction." Consequently, in 1967, BHP also built a primary distribution line to the plant, and BHP became the exclusive provider of electricity at the plant through one service point (Service Number One).

[¶ 7.] In 1973, Rapid City purchased an additional eighty acres of land. This land is adjacent to the original forty acres on which the plant is located. The new land was important to the City because it provided access to Rapid Creek: "because that's where after they've treated the water where it goes and they planned to grow as the city did.... [T]hey bought extensive land so that they'd have that taken care of as they then grew into the future."

[¶ 8.] BHP continued to service the plant via Service Number One from 1967 until 1987. In 1987, BHP installed a second service point at the plant (Service Number Two). BHP did not consult with WREA when this installation occurred. Although WREA subsequently learned of Service Number Two, it took no action at that time to contest BHP's right to provide that new service.

[¶ 9.] Now, Rapid City is in the process of expanding the plant further. Consequently, four new electric service points will be installed. These are referred to as Service Numbers Three, Four, Five, and Six. This expansion will require new transformers and the extension of primary voltage wires. The new service points will, however, be located at the same plant on the original forty acre site.

[¶ 10.] BHP claims the right to provide all needed service at all six service points. However, WREA also claims the right to provide the new service added, or to be added, including the 1987 addition of Service Number Two. WREA contends that BHP's provision of service to Service Numbers Two through Six violates a second provision of the Territory Act. That provision generally prohibits one utility from rendering or extending service into the assigned service area of another utility. SDCL 49–34A–42. WREA specifically argues that the provision of service to anything other than the original Service Number One would be an illegal "extension of service" into WREA's assigned service area in violation of this second provision.

[¶ 11.] On a petition for declaratory ruling, the PUC agreed with WREA, determining that WREA had the right to provide the new service at Service Numbers Two through Six. It concluded that "the [statutorily protected] 'location' served by Black Hills at the Plant as of March 21, 1975, *was [only] such service as could be provided by means of the primary distribution line and transformer installed at such time* to serve Service Number One without the necessity for extending primary voltage lines." (Emphasis added.) Because the PUC ruled that the right to serve a "location" was restricted to that level of service available under the distribution system that existed in 1975, it concluded that "[t]he Plant is within West River's assigned service territory and West River has the right to provide all electric service at retail to the Plant with the exception of the service provided by Black Hills to Service Number One, which Black Hills was providing as of March 21, 1975."

[¶ 12.] The circuit court reversed the PUC's interpretation of the term "loca-

tion": an interpretation that limited the right to serve a "location" to the *level of service* that was available under the *distribution system existing in 1975*. Instead, the circuit court reasoned that the term "location" inherently implied a "geographically-described" parcel of property. The court concluded that the PUC erred in construing the word location "so as to preclude the extension of 'primary wires' or 'primary voltage lines,' which construction erroneously equate[d] the term 'location' to the extension of an 'electric line. . . .' " The court also ruled that:

> The 120 Acres is an undivided parcel of real property, that is not divided by a public road, a body of water, or other natural geographic features, and has never been legally platted or subdivided by Rapid City, and, as such, comprises a uniform "location" where Black Hills has served a customer since 1967.

The court ultimately declared that BHP had the right to provide the new service at the Rapid City waste water treatment plant because it was within the contiguous 120 acre tract.

[¶ 13.] WREA and the PUC appeal the circuit court's decision and raise the following questions: (1) whether BHP is rendering or has extended service within WREA's territory in violation of the second sentence of SDCL 49-34A-42; and (2) whether the circuit court erred in determining that the right to serve a "location," as provided in the first sentence of SDCL 49-34A-42, means the entirety of a contiguous tract of real property. We believe both questions are resolved by the following issue:

> **Whether the legislature intended the word "location" to be a geographically based concept, or whether it intended that the right to serve a "location" was limited to the level of service that was provided by means of the distribu-**

tion system existing on March 21, 1975.

## ANALYSIS AND DECISION

[¶ 14.] The Territorial Act, found in SDCL ch. 49-34A, "evidences a legislative intent for [the] PUC to have broad inherent authority in matters involving utilities in this state." *In re Northern States Power Co.,* 489 N.W.2d 365, 370 (S.D.1992). However, a resolution of the issue in this case requires statutory construction. Questions of law concerning statutory construction are reviewed de novo. *Goetz v. State,* 2001 SD 138, ¶ 8, 636 N.W.2d 675, 678 (citing *State v. Karlen,* 1999 SD 12, ¶ 6, 589 N.W.2d 594, 597). Therefore, this determination is "fully reviewable without deference to legal conclusions drawn by either the PUC or the circuit court." *In re Northwestern Public Serv. Co.,* 1997 SD 35, ¶ 13, 560 N.W.2d 925, 927 (citing *Egemo v. Flores,* 470 N.W.2d 817 (S.D.1991); *Permann v. Dept. of Labor,* 411 N.W.2d 113 (S.D.1987)).

[¶ 15.] Statutory construction is an exercise to determine legislative intent. In analyzing statutory language:

> [W]e adhere to two primary rules of statutory construction. The first rule is that the language expressed in the statute is the paramount consideration. The second rule is that if the words and phrases in the statute have plain meaning and effect, we should simply declare their meaning and not resort to statutory construction.

*Goetz,* 2001 SD 138, ¶ 15, 636 N.W.2d at 681. When we must, however, resort to statutory construction, "[t]he intent of the legislature is 'derived from the plain, ordinary and popular meaning of statutory language.' " *Northwestern Public Serv. Co.,* 1997 SD 35, ¶ 14, 560 N.W.2d at 927 (citing *Whalen v. Whalen,* 490 N.W.2d 276, 280 (S.D.1992)).

[¶ 16.] SDCL 49–34A–42 is the dispositive statute. It provides:

> Each electric utility has the *exclusive right* to provide *electric service* at retail at each and every *location* where it is serving *a customer* as of March 21, 1975, and to each and every present and future customer in its assigned service area. No electric utility shall render or extend electric service at retail within the assigned service area of another electric utility unless such other electric utility consents thereto in writing and the agreement is approved by the commission consistent with § 49–34A–55. However, any electric utility may extend its facilities through the assigned service area of another electric utility if the extension is necessary to facilitate the electric utility connecting its facilities or customers within its own assigned service area[.]

(Emphasis added.)

[¶ 17.] The first sentence of this statute grants two rights. First, it grants the exclusive right to continue to serve each and every *location* where a utility was serving *a customer* on March 21, 1975. Second, it grants the right to serve each and every present and future customer in the utility's assigned service area. In a previous case involving this language we observed that:

> By the terms of this statute, the Legislature provided two specific types of protection. First, it assured that each utility would be granted all future service rights within its designated service area; and second, it protected individual service existing at the time the franchise was granted.

*In re Clay–Union Elec. Corp.,* 300 N.W.2d 58, 61–62 (S.D.1980). This dispute focuses on the nature and extent of that "protected individual service" that exists after the franchise was granted.

[¶ 18.] WREA and the PUC support their position by emphasizing our foregoing reference to the phrase "individual *service.*" They also rely on the legislative prohibition on the "extension of *service* " in the second sentence of SDCL 49–34A–42. Focusing on the word "service" in both phrases, they contend that the right to serve a "location" is limited to the level of service (Service Number One) that BHP had in place on March 21, 1975. According to WREA and the PUC, this level of protected service is further circumscribed by the distribution system (the electrical lines, transformer, and single meter) that was used by BHP to serve the plant on March 21, 1975. WREA and the PUC finally support their position by arguing that the protected right to serve pre-existing "locations" should be viewed as a "narrow exception" to a "general rule" prohibiting the extension of service. As they view it, in order to advance this "broader" prohibition on the extension of service in the second sentence, BHP's service rights under the first sentence must be narrowly limited to those levels provided by the distribution system that existed in 1975. However, we fail to see any of these elaborate restrictions in the simple and plain meaning of the word "location."

[¶ 19.] The PUC concedes that the dictionary definition of a "location" is "[a] place where something is or could be located; a site." Nevertheless, it insists that its limiting construction is reasonable and consistent with the Territorial Act's objectives. According to the PUC, its "narrow construction of the term 'location' [is] appropriate.... [A]pplication of the term in a given case should be *centered on the electric distribution system* " since the original territory assignments were "based on the electric distribution system and not on customer property boundaries or customer choice." However, we observe that

there were five criteria for establishing the original service territories, and three of the other criteria arguably favor a broader view of the service that BHP may provide at this location. Those other criteria include: the *prevention* of duplication of distribution lines and facilities, the willingness and good-faith intent of the electric utility to provide adequate service, and that a reasonable opportunity be given *"for future growth within the contested area. ..."* SDCL 49–34A–44 (emphasis added). Thus, we do not believe that on balance, the criteria for establishing the original service territories is dispositive.

[¶ 20.] The PUC and WREA also argue that "the term 'location' should be ... construed *in pari materia* both with the term 'extended electric service' in the second sentence of SDCL 49–34A–42 and with the [above] criteria for service area assignment contained in SDCL 49–34A–43 and 49–34A–44." However, as was previously mentioned, some of those criteria favor a broader interpretation of "location." More importantly, if the Legislature had intended the word "location" to be synonymous with some "level of electric service," it would have used the latter language instead of the word "location." By using the words *"location* where it is serving *a customer"* at one place in the statute and the words "electric service" in other places in the same statute, the inescapable conclusion is that the Legislature's use of the word "location" meant something other than "a level of electric service" being provided on March 21, 1975.

[¶ 21.] We also believe that the PUC's and WREA's interpretation of "location" fails to give due regard to the plain meaning and effect of the phrase "exclu-sive right to provide service at each and every *location* where it is serving a *customer."* As we have previously stated:

> The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and *the court must confine itself to the language used.*
>
> Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and *the Court's only function is to declare the meaning of the statute as clearly expressed.*

*Martinmaas v. Engelmann,* 2000 SD 85, ¶ 49, 612 N.W.2d 600, 611 (further citations omitted) (emphasis added). Moreover, "[i]n arriving at the intention of the Legislature, it is presumed that the words of the statute have been used to convey their ordinary, popular meaning." *Oahe Conservancy Subdistrict v. Janklow,* 308 N.W.2d 559, 561 (S.D.1981) (citing *Wood v. Waggoner,* 67 S.D. 365, 293 N.W. 188 (1940)). "SDCL 2–14–1 requires that words in a statute are to be understood in their ordinary sense."[1] *Id.* We finally note that a "[j]udicial interpretation of a statute that faile[s] to acknowledge its plain language would amount to judicial supervision of the legislature." *State v. Galati,* 365 N.W.2d 575, 577 (S.D.1985).

[¶ 22.] In this case, the ordinary meaning of the word "location" is a geographical area. Black's Law Dictionary defines "location" as: "1. The specific place or position of a person or thing.... 3. *Real Estate.* The designation of the boundaries or a particular piece of land, either on the record or on the land it-

---

1. SDCL 2–14–1 states: "Words used are to be understood in their ordinary sense except also that words defined or explained in § 2–14–2 are to be understood as thus defined or ex-plained." The Legislature defined thirty-six terms in SDCL 2–14–2. "Location" was not defined in this statute.

self. ..." Black's Law Dictionary 951 (7th ed. 1999). · The ordinary dictionary definition also defines "location" as: "... 2. A place where something is or could be located; a site.... 4. A tract of land that has been surveyed and marked off." The American Heritage College Dictionary 795 (3rd ed. 1997). Although the Legislature did not specifically define "location" in SDCL 49–34A–42, it did, however, define "assigned service area," as a geographical concept: "the *geographical area* in which the *boundaries* are established as provided in §§ 49–34A–42 to 49–34A–44, inclusive, and §§ 49–34A–48 to 49–34A–59, inclusive." SDCL 49–34A–1(1) (emphasis added). We therefore believe that the phrase "location where it is serving a customer," when used in its ordinary sense, requires this ordinary geographical meaning. There is certainly nothing in the plain text of the statute that restricts the right to serve a "location" to some "level of service" that is measured by some after-the-fact PUC described distribution system.

[¶ 23.] We have previously recognized this geographically centered basis for the Act. In *Clay–Union,* 300 N.W.2d 58, we recognized that "the legislative intent in enacting SDCL ch. 49–34A was to prevent this very type of service dispute by allocating each utility an exclusive franchise within *specific boundaries.*" *Id.* at 61 (emphasis added). We have also noted that SDCL 49–34A includes "no provision for change of provider where there's been a change of ownership or the customer changes its preference, *or there's a load reduction.*" *Northwestern Public Serv. Co.,* 1997 SD 35, ¶ 25, 560 N.W.2d at 929 (emphasis added). If therefore, the Act does not contemplate a change in provider

for a load reduction, the Legislature could not have intended a change in provider where there is a load increase caused by an increase in the needs of an existing customer. As then Chief Justice Wollman observed in another case in 1979, SDCL 49–34A–42 includes "no express or implied exceptions based upon the nature of the customer or the *extent* or duration of the service provided prior to March 21, 1975." *In re Certain Territorial Elec. Boundaries (Aberdeen),* 281 N.W.2d 72, 78 (S.D.1979) (Wollman, C.J., concurring in part and dissenting in part) (emphasis added).

[¶ 24.] We also note that shortly after the Territory Act was passed, the PUC itself declined to limit "location" service rights to some level of service or some distribution system that was in existence in 1975. Instead, the PUC utilized the geographically-based definition, concluding that the right to provide service to a new manufacturing plant, built partially on the site of what had previously been a farmhouse and trailer, "constituted the same location" within the meaning of SDCL 49–34A–42.[2] *Clay–Union,* 300 N.W.2d at 60. Significantly, the PUC applied the geographically-based definition, even though the new manufacturing plant's electrical needs required the extension of a new three-phase distribution line 3200 ft. into the other utilities territory. Moreover, the vast majority of the new plant's square footage existed apart from the service locations, outlets, and farm structures that were previously serviced.

[¶ 25.] We acknowledge the PUC's argument that because it is an administrative agency, it is not bound by stare decisis,[3] and therefore it can redefine

---

**2.** Although we reversed on other grounds, the PUC's view of the statute shortly after it passed is instructive.

**3.** In the judicial setting, previously decided questions of law involving similar fact situations often provide precedential value, embodying the concept of stare decisis. Both

its views to reflect its current view of public policy[4] regarding the utility industry. We also acknowledge that "[t]his [C]ourt has previously stated that the PUC is deemed to be an administrative tribunal with expertise," *Northern States Power Co.*, 489 N.W.2d at 370 (citing *In re Jack Rabbit Lines, Inc.*, 283 N.W.2d 402 (S.D.1979)), and that we give "appropriate deference to PUC's expertise and special knowledge in the field of electric utilities." *Id.* at 372. However, "[w]hile the expertise of the administrative agency is recognized, the agency must lend credence to the guidelines established in the statutes." *Northwestern Public Serv. Co.*, 1997 SD 35, ¶ 29, 560 N.W.2d at 929–30 (further citations omitted). "The PUC is not a court, and cannot exercise purely judicial functions." *Id.* ¶ 30 (citing *In re Dakota Transportation, Inc.*, 67 S.D. 221, 291 N.W. 589, 594 (1940)). "Defining and interpreting the law is a judicial function...." *Bandy v. Mickelson*, 73 S.D. 485, 488, 44 N.W.2d 341, 342 (1950). Therefore, even if the PUC has changed its view

of public utility policy, it cannot read into a statute a new definition of "location" that never previously existed. If the wording of SDCL 49–34A–42 is in need of revision to accommodate public policy changes in the utility industry, it is the responsibility of the Legislature, rather than the PUC, to change the statute.

[¶ 26.] We conclude that the plain meaning of the phrase "the exclusive right to provide electric service at retail at each and every location where it is serving a customer" contains no restriction that limits that right to only provide a level of electric service under some type of distribution system that the PUC identifies today. Rather, "location" denotes a place where something is or could be located; a site. Therefore, SDCL 49–34A–42 does not restrict BHP's exclusive right to provide all necessary electric service at the City's plant. It gives BHP the right to provide service to Service Numbers One through Six, as well as any future service at that location.[5] BHP's continued provi-

---

4. The PUC indicates that utility policy has changed since the 1975 Act. In a conclusion of law, the PUC attempts to justify its new interpretation, reasoning:

In the Commission's opinion, [today's] construction is bolstered by the elapse of twen-

federal and state courts have repeatedly noted, however, that administrative agencies are not bound by stare decisis as it applies to previous agency decisions. "The U.S. Supreme Court has stated that, 'An agency's view of what is in the public interest may change, either with or without a change in circumstances' ". *Yellow Robe v. Bd. of Trustees of SD Ret. Sys.*, 2003 SD 67, ¶ 14, 664 N.W.2d 517, 520 (quoting *Interstate Telephone Coop., Inc. v. Public Utilities Com'n of the State of SD*, 518 N.W.2d 749, 752–53 (SD 1994) (citing *Motor Vehicle Mfrs. Assn. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443, 446 (1983) (citation omitted))).

ty-seven years since passage of the 1975 Territory Act. Early in the territorial consolidation process, there may have been greater justification to weigh decisions in favor of an expansive definition of "location" to enable the serving utility to avoid a stranding and wasting of an investment undertaken in good faith without knowledge of the potential stranding effect of territory assignments. As time passes, however, investments in facilities made prior to 1975 have undergone normal depreciation, and less justification eventually remains to apply an expansive reading of "location" and increase the scope of anomalous services to recover fully depreciated or almost fully depreciated costs.

5. BHP asks this Court adopt the reasoning of the circuit court and an Illinois appellate court, which held that:

In order to constitute a separate location, there must be some feature of the area in question which would set it apart from the surrounding parcels. A public road, a body

sion of electric service to the plant is precisely what was protected by the first sentence of SDCL 49–34A–42, and therefore, it is not an extension of service into the territory assigned to WREA.

[¶ 27.] Affirmed.

[¶ 28.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.

of water, or a legal division (such as platting or subdividing the land) all could serve to distinguish one location from the surrounding area.

*Coles–Moultrie Elec. Coop. v. Illinois Commerce Com'n,* 76 Ill.App.3d 165, 31 Ill.Dec. 750, 394 N.E.2d 1068, 1069 (Ill.App.4th 1979). We need not address the circuit court's adoption of the *Coles–Moultrie* decision in this case. The petition for declaratory relief that commenced this action only sought the answer to two questions: (1) "[w]hether Black Hills is rendering or has extended service within West River's territory in violation of SDCL § 49–34A–42," and (2) "[w]hether West River has the right to provide future electrical services to the Sewer Plant within West River's assigned service area." Because we have addressed the specific issues presented by the petition and decided by the PUC, we need not address other reasoning of the circuit court.