#29610-a-MES
**2022 S.D. 19**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE ADMINISTRATIVE
APPEAL OF GARRY EHLEBRACHT,
STEVEN GREBER, MARY GREBER,
RICHARD RALL, AMY RALL, AND
LARETTA KRANZ,                                          Appellants,


       v.


CROWNED RIDGE WIND II, LLC, and
SOUTH DAKOTA PUBLIC UTILITIES
COMMISSION,                                             Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
DEUEL COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE DAWN M. ELSHERE
Judge

\* \* \* \*

A.J. SWANSON
Canton, South Dakota                          Attorney for appellants.


DANA VAN BEEK PALMER
MILES F. SCHUMACHER of
Lynn, Jackson, Shultz & Lebrun P.C.
Sioux Falls, South Dakota

\* \* \* \*

ARGUED
OCTOBER 5, 2021
OPINION FILED **03/23/22**

\* \* \* \*

BRIAN J. MURPHY of
NextEra Energy Resources, LLC
Juno Beach, Florida

Attorneys for appellees
Crowned Ridge Wind II, LLC.


AMANDA R. REISS
KRISTEN N. EDWARDS
Special Assistant Attorneys General
Pierre, South Dakota

Attorneys for appellees South
Dakota Public Utilities
Commission.

#29610

SALTER, Justice

[¶1.]        Crowned Ridge Wind II, LLC (Crowned Ridge) applied to the South Dakota Public Utilities Commission (the PUC) for a permit to construct a large-scale wind energy farm in northeast South Dakota.  Several individuals intervened and objected to Crowned Ridge's application.  After conducting an evidentiary hearing, the PUC issued a written decision approving the application.  The intervenors appealed to the circuit court, which affirmed the PUC's decision.  Six of the intervenors now appeal to this Court.  We affirm.

## Facts and Procedural History

[¶2.]        Crowned Ridge is a wind energy company that sought to construct a wind farm comprised of 132 wind turbines capable of producing 300.6 megawatts of electricity in Codington, Grant, and Deuel Counties (the Project).  Under the provisions of SDCL 49-41B-2(13), Crowned Ridge's Project was statutorily defined as a "wind energy facility" because its size and design contemplated generating "one hundred megawatts or more of electricity."  The Project also satisfied the broader statutory definition of a "facility," which includes a wide variety of energy facilities.  SDCL 49-41B-2(7).  Consequently, Crowned Ridge could not begin construction of the Project without obtaining a permit from the PUC.  SDCL 49-41B-4.[1]

[¶3.]        Crowned Ridge submitted its application for a permit on July 9, 2019.  The six individuals who are the appellants in this appeal (the Intervenors) timely

---

1.    Crowned Ridge was also required to secure the approval of the respective county zoning authorities before beginning construction on the Project.  *See Ehlebracht v. Deuel Cnty. Bd. of Adjustment*, 2022 S.D. 18, 972 N.W.2d 464.

sought and obtained party status to oppose the issuance of a permit.[2] Each of the Intervenors are residents of Deuel County living near the Project. Their opposition to the permit was primarily based on the wind turbines' production of ambient noise and a phenomenon known as shadow flicker, which refers to momentary disruptions of natural sunlight caused by the rotation of a wind turbine's blades.

[¶4.]     Crowned Ridge did not propose to construct turbines on land owned by the Intervenors and did not enter into lease or easement agreements with them, as it had done with the other area landowners on whose property the Project was directly sited. Members of this latter group are known as participating landowners, while those in the former category, including the Intervenors, are described as non-participating landowners.

[¶5.]     Where, as here, an application meets with opposition, the PUC conducts a contested case hearing using the procedures set out in South Dakota's Administrative Procedure Act contained in SDCL chapter 1-26. *See* SDCL 49-41B-17.2. For Crowned Ridge's application, the PUC conducted a hearing on February 4–6, 2020, to consider evidence and argument concerning the potential impact of the Project on the environment and surrounding communities.

[¶6.]     The evidentiary hearing produced extensive testimony from seventeen witnesses. Many of the witnesses had previously submitted "pre-filed" direct

---

2.     In addition to the applicant, parties to the permit application process also include PUC staff and "[a]ny person residing in the area where the facility is proposed to be sited, or any directly interested person" who asks to intervene and obtains "party status." SDCL 49-41B-17. The PUC ultimately granted party status as intervenors to nine individuals. Three of those individuals are not parties to this appeal.

testimony and exhibits to the PUC, detailing their views about the Project. *See* ARSD 20:10:22:39 (stating in part, "[u]pon the filing of an application pursuant to SDCL 49-41B-11, an applicant shall also file all data, exhibits, and related testimony which the applicant intends to submit in support of its application.").

[¶7.] For instance, Crowned Ridge submitted pre-filed direct testimony from Jay Haley, a wind energy consultant who was engaged by Crowned Ridge to conduct studies on the levels of noise and shadow flicker the Project would produce. At the evidentiary hearing itself, Haley testified that, based on the "conservative assumptions" of the sound study, the noise levels produced by the Project would fall within the applicable county guidelines of forty-five decibels measured at non-participating residences. Haley further testified that, based on the light study he conducted, the shadow flicker produced by the Project would fall within the county-imposed limits of no more than thirty hours of affected light per calendar year. [3]

[¶8.] Crowned Ridge also submitted pre-filed direct testimony from Christopher Ollson, PhD. Dr. Ollson was engaged by Crowned Ridge to study the potential health implications associated with sound and shadow flicker. At the evidentiary hearing, Dr. Ollson testified that the proposed limits of forty-five decibels of sound at non-participating residences and no more than thirty hours of shadow flicker would pose "no potential health or welfare risk to the county residents."

---

3. Zoning ordinances in both Grant and Deuel Counties included limitations on sound generation of forty-five decibels at non-participating residences and a shadow flicker limit of no more than thirty hours per year. The zoning ordinance for Codington County included a sound limit of fifty decibels at all residences but did not regulate shadow flicker.

[¶9.]    Darren Kearney, a utility analyst employed by the PUC staff, testified about the process by which the PUC has historically regulated shadow flicker limits. During cross-examination, counsel for the Intervenors questioned Kearney about a lower shadow flicker level (fifteen hours per year) previously imposed as a condition for a different wind energy project, known as Prevailing Wind Park.[4] Kearney explained that the fifteen-hour-per-year condition was not a recommendation from the PUC staff, but was instead adopted by the commissioners after an evidentiary hearing. Kearney further testified that, in working with the permit applicants, the PUC staff commonly deferred to county regulations setting the maximum amount of shadow flicker and incorporated those limits into the permit conditions. He stated the "there are no [PUC] regulations. It's a case-by-case basis."

[¶10.]    The PUC staff also submitted pre-filed direct testimony from acoustical engineer David Hessler who was engaged to review the noise study conducted by Jay Haley. During cross-examination at the evidentiary hearing, Hessler testified that the Project was "aggressively devised" by Crowned Ridge "in the sense of they're trying to put a lot of turbines into the project area." Hessler stated that Crowned Ridge had accommodated his requests to move certain turbines to alternate locations in an attempt to mitigate sound emissions. Nevertheless, Crowned Ridge was unable to achieve projected noise levels below forty decibels, which Hessler described as the ideal noise limit. In his view, "annoyance and

---

4.    *In re Prevailing Wind Park, LLC*, No. EL18-026, 2018 WL 6433657 (South Dakota Pub. Utils. Comm'n Nov. 28, 2018).

complaints from property owners and residents around the wind farm [are] more likely" at noise levels exceeding forty decibels.  Despite this conclusion, Hessler testified that he believed the forty-five-decibel limit proposed by Crowned Ridge was "a reasonable and fair noise limit."

[¶11.]	Hessler explained that he was also engaged by the PUC staff for the Prevailing Wind Park application and discussed the variance between the forty-five-decibel limit sought by Crowned Ridge and a forty-decibel condition imposed on Prevailing Wind Park.  As part of his assessment of the Prevailing Wind Park project, Hessler recommended a forty-decibel noise limit at non-participating residences because Prevailing Wind Park was able to achieve the "very, very rare" forty-decibel mark by being "very accommodating" in adjusting turbine sites.

[¶12.]	Later, in their post-hearing brief to the PUC, the Intervenors claimed that the effect of the turbines' sound and shadow flicker on their nearby property constituted a burden on land under principles of state easement law, and Crowned Ridge was therefore required to purchase easements or enter into lease agreements before constructing turbines near their property.  The Intervenors also alleged that the PUC failed to properly exercise its rulemaking authority because it had not adopted standards for the maximum levels of sound and shadow flicker.  On this latter point, the Intervenors highlighted the difference between the noise and shadow limits sought by Crowned Ridge and those imposed by the PUC on the Prevailing Wind Park project.

[¶13.] The PUC voted unanimously to approve Crowned Ridge's permit. In its final decision and order,[5] the PUC issued findings of fact and conclusions of law. *See* SDCL 1-26-24 ("The . . . decision shall contain a statement of the reasons therefor and findings of fact on each issue and conclusions of law necessary to the proposed decision . . . ."). As they relate to this appeal, the PUC found that Crowned Ridge "has all land rights needed to construct and operate the Project[,]" "that the Project will not adversely impact property values[,]" that Crowned Ridge "has appropriately minimized the sound level produced from the Project" and has "appropriately minimized the shadow and flicker for the Project[.]" The PUC ultimately concluded that Crowned Ridge "satisfied [its] burden of proving all of the requirements imposed by SDCL 49-41B-22 for issuance of the permit to construct by the preponderance of the evidence."[6]

---

5. *In re Crowned Ridge Wind II, LLC*, No. EL19-027, 2020 WL 1877721 (South Dakota Pub. Utils. Comm'n Apr. 6, 2020).

6. The text of SDCL 49-41B-22 provides:

> The applicant has the burden of proof to establish by a preponderance of the evidence that:
>
> (1) The proposed facility will comply with all applicable laws and rules;
>
> (2) The facility will not pose a threat of serious injury to the environment nor to the social and economic condition of inhabitants or expected inhabitants in the siting area. An applicant for an electric transmission line, a solar energy facility, or a wind energy facility that holds a conditional use permit from the applicable local units of government is determined not to threaten the social and economic condition of inhabitants or expected inhabitants in the siting area;

(continued . . .)

-6-

[¶14.]     The PUC's order contained forty-nine permit conditions. Condition twenty-six stated that the Project "shall not generate a sound pressure level . . . of more than 45 dBA[7] as measured within 25 feet of any non-participating residence unless the owner of the residence has signed a waiver[.]" Condition thirty-five similarly stated that "[s]hadow flicker at residences shall not exceed 30 hours per year unless the owner of the residence has signed a waiver." The permit also required Crowned Ridge to satisfy certain conditions on an ongoing basis during the Project's construction, operation, and decommissioning phases.

[¶15.]     The Intervenors filed a notice of appeal in circuit court seeking judicial review of the PUC's decision to issue the permit. *See* SDCL 49-41B-30 ("Any party to a permit issuance proceeding aggrieved by the final decision of the Public Utilities Commission on an application for a permit, may obtain judicial review of that decision by filing a notice of appeal in circuit court."). In their written argument to the circuit court, the Intervenors realleged their claims that the PUC

_____

(. . . continued)

    (3)    The facility will not substantially impair the health, safety or welfare of the inhabitants; and

    (4)    The facility will not unduly interfere with the orderly development of the region with due consideration having been given the views of governing bodies of affected local units of government. An applicant for an electric transmission line, a solar energy facility, or a wind energy facility that holds a conditional use permit from the applicable local units of government is in compliance with this subdivision.

7.    The term dBA refers to "A-weighted decibels." It "is a unit for measuring sound levels, approximately equal to the smallest difference in loudness detectable by the human ear." *Atkinson v. City of Pierre*, 2005 S.D. 114, ¶ 42 n.13, 706 N.W.2d 791, 802 n.13 (Sabers, J., dissenting).

was statutorily required to promulgate rules establishing sound and shadow flicker standards for all permit applications and that the PUC's issuance of the permit subjected their property to a "de facto easement." The Intervenors also raised two additional claims.

[¶16.]     First, they argued that the PUC's exercise of its permit authority allowed Crowned Ridge to emit noise and produce shadow flicker on their property without their consent, thereby resulting in an uncompensated taking under the state and federal constitutions. Second, the Intervenors suggested that the PUC's approval of the application had effectively foreclosed a future nuisance remedy they might otherwise seek against Crowned Ridge, which they alleged also constituted a taking.

[¶17.]     The circuit court affirmed the issuance of the permit. The court determined that the PUC was not required by statute to promulgate standards for sound and shadow flicker, but that the PUC was bound by the limits imposed by local county ordinances in conditioning permit approval. The court also determined that, as an administrative body, the PUC possessed no authority to create easements, and, in any event, the court was limited in the context of an administrative appeal to determining whether the PUC's findings were clearly erroneous without regard to ancillary claims regarding property rights. Finally, the court rejected the easement, taking, and nuisance claims, concluding the

Intervenors failed to demonstrate a taking under South Dakota law, and that the nuisance claim "was not ripe."[8]

[¶18.]     The Intervenors now appeal to this Court, raising five issues we have restated as follows:

1.     Whether the PUC is required by statute to promulgate rules establishing the maximum levels of noise and shadow flicker allowed for all wind energy facilities.

2.     Whether the PUC's issuance of the permit violated the equal protection clauses of the South Dakota Constitution and the United States Constitution.

3.     Whether the PUC's issuance of the permit created a "de facto easement" in favor of Crowned Ridge.

4.     Whether the PUC's issuance of the permit constitutes a per se taking.

5.     Whether the PUC's issuance of the permit would foreclose a future nuisance claim, thereby resulting in a compensable taking.

**Standard of Review**

[¶19.]     The text of SDCL 1-26-36 provides the bases upon which an administrative agency's decision may be reversed or modified, and provides in relevant part:

> The court shall give great weight to the findings made and inferences drawn by an agency on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been

---

8.     The Intervenors also made a passing reference in their brief to the equal protection clauses of the state and federal constitutions, claiming the variance between the permit conditions imposed on Crowned Ridge and those approved for Prevailing Wind Park violated those provisions. In a footnote to its memorandum opinion, the circuit court declined to address the claim, concluding it was "without merit."

prejudiced because the administrative findings, inferences, conclusions, or decisions are:

> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by other error of law;
> (5) Clearly erroneous in light of the entire evidence in the record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[¶20.]      We have held that "SDCL 1-26-36 delineates the standard for a circuit court's review of an administrative agency's decision, and '[t]he same rules apply on appeal to this Court.'" *Anderson v. South Dakota Ret. Sys.*, 2019 S.D. 11, ¶ 10, 924 N.W.2d 146, 148–49 (quoting *Lagler v. Menard, Inc.*, 2018 S.D. 53, ¶ 22, 915 N.W.2d 707, 715).  Stated precisely:

> Questions of law are reviewed de novo.  Matters of reviewable discretion are reviewed for abuse.  The agency's factual findings are reviewed under the clearly erroneous standard.  The agency's decision may be affirmed or remanded but cannot be reversed or modified absent a showing of prejudice.

*Id.* ¶ 10, 924 N.W.2d at 149 (cleaned up).

## Analysis and Decision

### *The PUC's Rulemaking Authority*

[¶21.]      The Legislature has found that "energy development in South Dakota . . . significantly affects the welfare of the population" and, therefore, "it is necessary to ensure that the location, construction, and operation of facilities will produce *minimal adverse effects* on the environment and upon the citizens of this state by providing that a facility may not be constructed or operated in this state without first obtaining a permit from the commission."  SDCL 49-41B-1 (emphasis added).

[¶22.]       The Legislature has also delegated to the PUC the authority to promulgate rules regarding the permitting and construction of wind energy facilities.  The text of SDCL 49-41B-35 provides:

> To implement the provisions of this chapter regarding facilities, the commission shall promulgate rules pursuant to chapter 1-26. Rules may be adopted by the commission:
>
> (1) To establish the information requirements and procedures that every utility must follow when filing plans with the commission regarding its proposed and existing facilities;
>
> (2) To establish procedures for utilities to follow when filing an application for a permit to construct a facility, and the information required to be included in the application; and
>
> (3) To require bonds, guarantees, insurance, or other requirements to provide funding for the decommissioning and removal of a solar or wind energy facility.

[¶23.]       Though the provisions of SDCL 49-41B-35 unquestionably require the PUC to promulgate its rules using the procedures set forth by the Legislature in chapter 1-26, the statute does not obligate the PUC to promulgate a particular rule or regulatory standard.  The text states only that the PUC's rules "*may* be adopted" to establish requirements and procedures regarding a wind energy facility's planning, application, and decommissioning processes.[9]  *Id.* (emphasis added); *see In re Groseth Int'l, Inc.*, 442 N.W.2d 229, 231 (S.D. 1989) ("Ordinarily, the word 'may' in a statute is given a permissive or discretionary meaning.  It is not obligatory or mandatory as is the word 'shall.'").  Read as a whole, SDCL 49-41B-35 simply operates as enabling legislation authorizing the PUC to undertake

---

9.       Pursuant to this delegation, the PUC has, in fact, adopted rules regulating the construction of wind energy facilities in South Dakota.  *See generally* ARSD 20:10:22 ("Energy Facility Siting Rules").

rulemaking within the enumerated subject areas. *See Boever v. South Dakota Bd. of Acct.*, 1997 S.D. 34, ¶ 15, 561 N.W.2d 309, 313 (holding that the Legislature must "provide[ ] a sufficient guide, standard or intelligible principle to the agency to direct the exercise of the delegated authority[.]").

[¶24.] The Intervenors allege that the combination of rulemaking authority in SDCL 49-41B-35 and the legislative findings in SDCL 49-41B-1 require the PUC to promulgate specific rules defining "minimal adverse effects" associated with proposed wind energy projects.[10] As the Intervenors envision it, these rules would regulate the maximum levels of noise and shadow flicker upon which the grant of all wind energy facility construction permits must be conditioned.[11] But this view is little more than a critique of the PUC's exercise of its rulemaking authority, unconnected to a textual or other legal basis for relief. Simply put, there is no requirement for the PUC to use its rulemaking authority to further define "minimal adverse effects" resulting from wind energy facilities.

---

10. Codified legislative findings, such as those in SDCL 49-41B-1, are not uncommon and carry the force of law as any other statutory text, but "[t]hey should not be used to give meaning to other parts of the statute that the words will not bear." Jarrod Shobe, *Enacted Legislative Findings and Purposes*, 86 U. Chi. L. Rev. 669, 675 (2019) (cleaned up).

11. The Intervenors go further than this, conceding both in the their brief and at oral argument that *any* amount of noise and shadow flicker generated by wind turbines is intolerable to them and that the PUC should simply prohibit these effects on the properties of non-participating landowners as a condition of issuing a construction permit. This perspective, while perhaps defensible as a free-standing policy position, severely undercuts the textual argument they make here by suggesting that the only acceptable interpretation of "minimal adverse effects" is none at all.

[¶25.]        The Intervenors' arguments concerning the PUC's obligation to ensure "minimal adverse effects" are better viewed in the context of SDCL 49-41B-22, which sets out the burden of proof placed on applicants during the permitting process and the evidence the applicant must present in order to receive a permit. As noted above, this section requires that the applicant "establish by a preponderance of evidence that: . . . [t]he proposed facility will comply with all applicable laws and rules" and that "[t]he facility will not substantially impair the health, safety or welfare of the inhabitants[.]" *See supra* note 6.

[¶26.]        As "an administrative tribunal with expertise," *In re W. River Elec. Ass'n, Inc.*, 2004 S.D. 11, ¶ 25, 675 N.W.2d 222, 230 (citation omitted), the PUC is tasked with reviewing the evidence submitted by applicants and assessing their compliance with the directives of SDCL 49-41B-22. As it relates to this appeal, the PUC's factual findings and conclusions of law make the express determination that Crowned Ridge "satisfied [its] burden of proving all of the requirements imposed by SDCL 49-41B-22[.]" By imposing conditions limiting the level of noise and shadow flicker that the Project may produce, the PUC required compliance with Deuel County ordinances. The PUC was sufficiently convinced by the evidence presented that noise and shadow flicker within those limits would not substantially impair the health, safety, or welfare of local residents—a conclusion the Intervenors do not directly challenge. To the extent the Legislature requires the PUC to ensure the Project will produce "minimal adverse effects," it has done so by crafting the noise and shadow flicker limits based on its careful review of the voluminous evidence presented by the parties.

[¶27.] We conclude, therefore, that the PUC has satisfied the obligation imposed on it by the Legislature in its consideration of Crowned Ridge's application, and the PUC was not otherwise required to promulgate rules defining "minimal adverse effects."

**_Equal Protection_**[12]

[¶28.] Additionally, the Intervenors allege that the PUC's "ad hoc" determinations of limits for sound and shadow flicker violate the equal protection provisions of the state and federal constitutions. They point to differences between the permit conditions approved for Crowned Ridge and those imposed for the separate and unrelated Prevailing Wind Park project described above. The Intervenors claim that the PUC's imposition of regulatory limits on a case-by-case basis allows applicants like Crowned Ridge to exert influence over the permitting process by submitting "aggressively devised" projects, which necessarily results in the PUC's approval of higher sound or shadow flicker levels.

[¶29.] As an initial matter, we note that as an administrative agency the PUC "is not bound by stare decisis, and therefore it can redefine its views to reflect its current view of public policy regarding the utility industry." 2004 S.D. 11, ¶ 25, 675 N.W.2d at 230. _See also Yellow Robe v. Bd. of Trustees of South Dakota Ret. Sys._, 2003 S.D. 67, ¶ 14, 664 N.W.2d 517, 520 ("An agency's view of what is in the public interest may change, either with or without a change in circumstances."

---

12. There is some question whether the Intervenors preserved an equal protection claim. They did not make the argument before the PUC and include only a single-sentence reference to equal protection in their circuit court brief. Preserved or not, however, the Intervenors have not identified a colorable equal protection claim here for the reasons we explain below.

-14-

(citations omitted)). Moreover, conducting a studied, individualized determination reflects the very nature of a contested case hearing and is precisely what administrative tribunals possessing expertise, like the PUC, are designed to do.

[¶30.]    Regardless, the Intervenors' claim appears unsustainable under a basic application of our decisional law regarding equal protection. As we have previously held, "[t]his Court has adopted a two-pronged test regarding equal protection when legitimacy, suspect classes and fundamental rights are not involved[.]" *Cheyenne River Sioux Tribe Tel. Auth. v. Pub. Utils. Comm'n of South Dakota*, 1999 S.D. 60, ¶ 46, 595 N.W.2d 604, 614 (cleaned up). The principal inquiries under that test are "(1) [w]hether the statute does set up arbitrary classifications among various persons subject to it[ and] (2) [w]hether there is a rational relationship between the classification and some legitimate purpose." *Id.*

[¶31.]    Here, the Intervenors are not challenging the constitutionality of a specific statute as is often the case in equal protection claims. Rather, the Intervenors take issue with the outcome of a contested case before an administrative tribunal. At the heart of the Intervenors' claim is their belief that the difference between the noise and shadow flicker conditions for Crowned Ridge and Prevailing Wind Park reflect unconstitutional disparity.

[¶32.]    Beyond this conclusory view, however, the Intervenors' equal protection argument is not further developed. Indeed, the Intervenors simply presume the difference between the limits for the Crowned Ridge and Prevailing Winds projects implicate equal protection concerns solely because they are different, and the Intervenors make no attempt to analyze their claim under the rules

governing equal protection. Under the circumstances, we conclude that the Intervenors have not identified a cognizable equal protection claim.[13]

## "De Facto Easements"

[¶33.] "An easement is a property interest in land owned by or in the possession of another, which entitles the easement owner to a limited use or enjoyment of the land in which the interest exists." *Picardi v. Zimmiond*, 2004 S.D. 125, ¶ 16, 689 N.W.2d 886, 890 (cleaned up). "Easements may be created by written grants, pursuant to a plat or by force of law." *Kokesh v. Running*, 2002 S.D. 126, ¶ 12, 652 N.W.2d 790, 793. The provisions of SDCL 43-13-2 list various types of easements recognized in South Dakota, including "[t]he right of receiving air, light, or heat from or over, or discharging the same upon or over land[.]" SDCL 43-13-2(8).

[¶34.] Here, the Intervenors claim that the intermittent occurrence of shadow flicker as a result of the operation of the wind turbines constitutes a discharge of

---

13. The United States Supreme Court has recognized the potential for equal protection claims brought by a "'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074, 145 L. Ed. 2d 1060 (2000) (citations omitted). In a concurring opinion in *Olech* that has since been cited by several federal courts of appeals, Justice Breyer observed that the case presented a sufficiently pled class-of-one equal protection claim because the plaintiff alleged more than simply disparate treatment, contending a government official "took 'vindictive action' or acted with 'illegitimate animus' against the claimant." *Mathers v. Wright*, 636 F.3d 396, 401 n.2 (8th Cir. 2011) (quoting Justice Breyer's concurring opinion in *Olech*, 528 U.S. at 566, 120 S. Ct. at 1075, and citing cases discussing *Olech*). We have never applied *Olech* or considered a class-of-one equal protection claim, and this case does not present such an opportunity. The Intervenors have not cited *Olech* and have not described anything more than the PUC's different conditions in different wind farm permit applications.

light as contemplated by SDCL 43-13-2(8). The Intervenors argue that the PUC's issuance of the permit is equivalent to granting an easement in favor of Crowned Ridge for the discharge of light over their property without the Intervenors' consent. This argument is essentially the same claim we considered and rejected in a decision also issued today, *Ehlebracht v. Deuel County Board of Adjustment*, 2022 S.D. 18, 972 N.W.2d 464.[14]

[¶35.]     In *Ehlebracht v. Deuel County*, we were unable to reconcile the text of SDCL 43-13-2(8) with the nature of shadow flicker, noting that the "plain language [of SDCL 43-13-2(8)] does not support the . . . argument that the 'adulterated light' resulting from the operation of wind turbines constitutes a discharge of light." *Id.* ¶ 29, 972 N.W.2d at 474. We further observed that "[w]ind turbines no more *discharge* light by casting a shadow than does a grain silo or a multi-story office building" and noted the irrefutable fact "that the source of light is, of course, the sun." *Id.* The same reasoning is true here, and we similarly conclude that the operation of wind turbines does not result in a discharge of light, thereby rendering any application of SDCL 43-13-2(8) inapposite.

[¶36.]     Moreover, as the circuit court noted, the PUC is an administrative body charged by the Legislature with considering applications for wind energy facility construction permits, not determining questions involving easement law. The PUC's issuance of the permit in this case does not subject the Intervenors' property to an easement. *Id.* ¶ 35, 972 N.W.2d at 475. Crowned Ridge retains no

---

14.     The appellants in *Ehlebracht v. Deuel County* are the same individuals intervening in the permitting process here and were represented by the same attorney during their appeal in that case.

interest in the Intervenors' property and the Intervenors have not been forced to relinquish any legally recognized property rights. They are not bound by any agreement with Crowned Ridge and may compel Crowned Ridge's compliance with the shadow flicker limits imposed by the permit conditions set by the PUC.

[¶37.] Therefore, we conclude here that the statutory provisions of SDCL 43-13-2(8) are not implicated by the PUC's decision to issue the construction permit to Crowned Ridge.

### The Issuance of the Permit as a Taking[15]

[¶38.] The United States Constitution prohibits the taking of property "for public use, without just compensation." U.S. Const. amend. V. "Takings jurisprudence at a federal level involves, at a minimum, two distinct categories of deprivations: (1) physical occupations of land; or (2) regulatory takings." *Krsnak v. Brant Lake Sanitary Dist.*, 2018 S.D. 85, ¶ 16, 921 N.W.2d 698, 702.

[¶39.] Within these classifications, we have previously held that claimants seeking compensation from the government under a takings claim must generally pursue their claim under one of four theories:

> 1) "a per se regulatory physical taking under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct.

---

15. The appellants in *Ehlebracht v. Deuel County* made a similar, but distinct, claim in which they argued their substantive due process rights were violated under multiple theories, including the contention that the exercise of Deuel County's zoning authority effected a taking. After holding that the exercise of the county's zoning authority did not violate due process, we concluded that the appellants could not reform their due process claim into a takings theory. *See* 2022 S.D. 18, ¶ 46, 972 N.W.2d at 477. Here, however, the Intervenors do not allege a substantive due process violation and have presented a more direct takings argument, which we address on the merits.

3164, 73 L. Ed. 2d 868 (1982), where government requires an owner to suffer a permanent physical invasion of her property";

2) "a per se total regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992), that deprives an owner of all economically beneficial uses of the property";

3) "a regulatory taking under *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978), when a temporary or partial taking is alleged"; or

4) "a land-use exaction violating the standards as set forth in *Nollan v. California Coastal Comm'n.*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994)."

*Benson v. State*, 2006 S.D. 8, ¶ 46, 710 N.W.2d 131, 149 (cleaned up) (citing *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39, 545–48, 125 S. Ct. 2074, 2081–82, 2086–87, 161 L. Ed. 2d 876 (2005)).

[¶40.]     The text of our South Dakota Constitution also contains a takings clause; however, it differs from the federal Constitution in one important respect. Article VI, section 13 of the South Dakota Constitution states: "Private property shall not be taken for public use, *or damaged*, without just compensation . . . ." (Emphasis added).  Recognizing consequential "damage" to property as a compensable result of government action "provides an additional theory by which a plaintiff may bring a claim for damages against the state." *Krier v. Dell Rapids Twp.*, 2006 S.D. 10, ¶ 23, 709 N.W.2d 841, 847.

[¶41.]     In order to recover under this consequential damages theory, the plaintiff must show that the injury is "peculiar to the owner's land and not of a kind suffered by the public as a whole." *Id.*  "The injury to the plaintiff 'must be different in kind and not merely in degree from that experienced by the general public.'" *Id.*

¶ 26, 709 N.W.2d at 848 (quoting *Hurley v. State*, 82 S.D. 156, 163, 143 N.W.2d 722, 726 (1966)).

[¶42.]     It is unclear which of the taking or damage theories outlined above the Intervenors allege is applicable to the actions of the PUC.  Beyond the bare assertion in their brief that the issuance of the permit would result in a "per se" taking, they make no attempt to analyze their claim under our takings precedent. Although the Intervenors cite the recent United States Supreme Court decision of *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 210 L. Ed. 2d 369 (2021), to support their claim that the permit results in a per se physical taking, the Intervenors' reliance on the case is misplaced.

[¶43.]     In *Cedar Point*, the Supreme Court examined a California law that granted labor organizations a right of access to private farms in order to speak with farm laborers at various times throughout the day, up to 120 days per year.  141 S. Ct. at 2069.  Two California fruit farmers argued that the law constituted a per se physical taking because it required them to allow union representatives to enter and remain on their farms.  *Id.* at 2069–70.  After examining its takings jurisprudence, the Court concluded, "The access regulation appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking."  *Id.* at 2072.

[¶44.]     Here, however, there is no physical invasion of the Intervenors' property in any legally cognizable sense, as a survey of principal "physical-invasion" takings decisions illustrates.  *See, e.g.*, *id.* at 2074 (the right of union officials "to literally 'take access'" to the farmers' operations); *Loretto*, 458 U.S. at 422, 102 S.

Ct. at 3169 (the installation of cable boxes on a privately owned apartment complex); *Kaiser Aetna v. United States*, 444 U.S. 164, 168, 100 S. Ct. 383, 387, 62 L. Ed. 2d 332 (1979) (the right of public access to a private marina by boat); *United States v. Causby*, 328 U.S. 256, 259, 66 S. Ct. 1062, 1064, 90 L. Ed. 1206 (1946) (military aircraft flying low over the rooftops of private homes); *see also Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 10, 827 N.W.2d 55, 61 ("[A]n action by a landowner for inverse condemnation is maintainable where a governmental entity causes an invasion of the land by water, earth, sand, or other matter or artificial structures placed upon it . . . .") (cleaned up).

[¶45.]     Despite invoking the per se taking designation, the Intervenors have failed to support their claim under a recognized legal theory.  Under the circumstances, we conclude that PUC's decision to approve Crowned Ridge's permit application to construct wind turbines on sites *not* owned by the Intervenors was not a physical invasion of their property.

[¶46.]     Beyond this, Intervenors have not suggested this case involves a per se regulatory taking under *Lucas*, 505 U.S. 1003, 112 S. Ct. 2886, or a partial regulatory taking under *Penn Central*, 438 U.S. 104, 98 S. Ct. 2646.  And no governmental entity has exacted an easement from the Intervenors in exchange for the grant of a building permit or zoning variance as would establish a taking under *Nollan*, 483 U.S. 825, 107 S. Ct. 3141, and *Dolan*, 512 U.S. 374, 114 S. Ct. 2309.

[¶47.]     If the Intervenors' arguments suggest any sort of taking claim, it is, at best, the assertion that the PUC's decision to grant Crowned Ridge's application has caused compensable damages in a *Krier*-style claim arising under Article VI, section

13 of the South Dakota Constitution. As we have previously held, this type of claim does not require "that the damage . . . be caused by a trespass or an actual physical invasion of the owner's real estate." *Rupert*, 2013 S.D. 13, ¶ 10, 827 N.W.2d at 61 (cleaned up). However, the Intervenors have not alleged, much less established, that the noise and shadow flicker would satisfy *Krier's* specific damage requirement.

[¶48.] We conclude, therefore, that the Intervenors have not established that the PUC exceeded its authority by issuing the construction permit to Crowned Ridge under the theory that the permit resulted in an uncompensated taking under the federal or state constitutions.

### *Foreclosure of a Nuisance Claim as a Taking*[16]

[¶49.] The provisions of SDCL 21-10-2 state that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance." The Intervenors assert that by issuing the permit, the PUC has foreclosed the prospects of a future nuisance claim, thereby resulting in a compensable taking. As support for their argument, the Intervenors cite an Iowa Supreme Court decision, *Bormann v. Board of Supervisors ex. rel Kossuth County*, 584 N.W.2d 309 (Iowa 1998).

---

16. This argument differs from a related claim considered and rejected in *Ehlebracht v. Deuel County*. There, the appellants simply lamented what they believed to be the inability to pursue a future nuisance claim as the result of Crowned Ridge's county permitting process. We held that the nuisance argument was non-cognizable under the well-settled standards for certiorari review. *See* 2022 S.D. 18, ¶ 39, 972 N.W.2d at 476. Here, however, the Intervenors have alleged specifically that foreclosing a nuisance remedy impacts a property right and constitutes a taking.

[¶50.] In *Bormann*, the court held that "statutory immunity from nuisance suits results in a taking of private property for public use without just compensation." *Id.* at 311. Citing its nineteenth century decision in *Churchill v. Burlington Water Co.*, 62 N.W. 646, 647 (Iowa 1895), the Iowa Supreme Court reaffirmed its view "that the right to maintain a nuisance is an easement." 584 N.W.2d at 315. Therefore, eliminating that right through a legislative grant of nuisance immunity, the court reasoned, is a taking.

[¶51.] But the decision in *Bormann* appears to be an outlier. We have never regarded the right to maintain a nuisance as an easement. *See Schliem v. State ex rel. Dep't of Transp.*, 2016 S.D. 90, ¶ 14 n.10, 888 N.W.2d 217, 224 n.10 ("What property is and the rights that attach to ownership are primarily a matter of state law." (citation omitted)). Nor have we held that statutes providing immunity from nuisance suits effect a taking, and neither, it appears, have any other states. *See Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 232–33 (Iowa 2018) ("All fifty states have right-to-farm laws that provide farmers with various forms of statutory immunity from nuisance claims . . . but Iowa is the only state to hold that the statutory immunity available under its right-to-farm law is unconstitutional in any manner."); *see also Lindsey v. DeGroot*, 898 N.E.2d 1251, 1259 (Ind. Ct. App. 2009) ("[W]e have found nothing to suggest that Indiana has adopted the seemingly unique Iowa holding that the right to maintain a nuisance is an easement . . . ."); *accord Moon v. N. Idaho Farmers Ass'n*, 96 P.3d 637, 644 (Idaho 2004).

[¶52.] We conclude that preempting nuisance suits under SDCL 21-10-2 does not constitute a taking. Therefore, the Intervenors cannot, on that basis, challenge

the PUC's decision to grant the permit. *See Schliem*, 2016 S.D. 90, ¶ 13, 888 N.W.2d at 224 ("[T]he first step in any Article VI analysis must be to determine whether a recognized property right has been infringed by state conduct.").

## Conclusion

[¶53.] The Intervenors have failed to raise any meritorious issues upon which the final decision and order of the PUC may be reversed or modified. We affirm.

[¶54.] KERN, DEVANEY, and MYREN, Justices, and ANDERSON, Circuit Court Judge, concur.

[¶55.] ANDERSON, Circuit Court Judge, sitting for JENSEN, Chief Justice, disqualified.

[¶56.] JENSEN, Chief Justice, deeming himself disqualified, did not participate.